```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
HARTFORD FIRE INSURANCE COMPANY,                                  :
                                                                  :
                          Plaintiff,                              :
                                                                  :       22-CV-0557 (JMF)
            -v-                                                   :
                                                                  :       OPINION AND ORDER
THE WESTERN UNION COMPANY et al.,                                 :
                                                                  :
                          Defendants.                             :
                                                                  :
------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

In this case, Hartford Fire Insurance Company ("Hartford Fire") sues its insureds, the Western Union Company and Western Union Financial Services (together, "Western Union"), seeking a declaration that it has no duty to defend or indemnify Western Union in a separate lawsuit pending in this District, *Schansman v. Sberbank of Russia PJSC*, No. 19-CV-2985 (ALC) (S.D.N.Y. filed Apr. 4, 2019) ("*Schansman*"). Western Union brings counterclaims, seeking both a declaration to the opposite effect and damages for alleged breach of contract and statutory bad faith. Before the Court are Western Union's motion for partial judgment on the pleadings and Hartford Fire's cross-motion for judgment on the pleadings and motion to dismiss Western Union's counterclaims. For the reasons that follow, the Court concludes that Hartford Fire has no duty to defend or indemnify Western Union because at least two exclusions from coverage apply. Accordingly, Western Union's motion for partial judgment on the pleadings is DENIED, and Hartford Fire's two motions are GRANTED.

## BACKGROUND

On July 17, 2014, the Donetsk People's Republic (the "DPR"), a Russian-backed separatist group in eastern Ukraine, shot down Malaysia Airlines Flight 17 ("MH17"). *See* ECF

No. 1-3 ("*Schansman* Compl."), ¶¶ 1, 4.  One of the victims of that attack was Quinn Schansman, an American college student.  *Id.* ¶ 1.  In 2019, Schansman's family filed a lawsuit in this District against Western Union and other financial institutions for "provid[ing] ongoing and essential financial support to the DPR from around the world."  *Id*. ¶¶ 3, 70-71.  Western Union duly tendered the lawsuit to Hartford Fire, seeking coverage under a commercial general liability insurance policy (the "Policy").  *See* ECF No. 1 ("Compl."), ¶ 2; ECF No. 1-2 ("Policy").[1]  Thereafter, Hartford Fire rejected Western Union's demand, asserting that the lawsuit fell within the scope of an exclusion in the Policy (discussed in more detail below) for bodily injury, "however caused, arising, directly or indirectly, out of . . . war, . . . warlike action by a military force, . . . or insurrection, rebellion, revolution, [or] usurped power" (the "War Exclusion").  *See* ECF No. 1-4; *see also* Policy 14, § I(2)(i).[2]  After Western Union requested that Hartford Fire reconsider its position, *see* ECF No. 1-5, the insurer filed this suit seeking a declaration that it has no duty to defend or indemnify Western Union in connection with the *Schansman* lawsuit.[3]

## APPLICABLE LEGAL STANDARDS

A Rule 12(c) motion for judgment on the pleadings is subject to the same legal standards as a Rule 12(b)(6) motion to dismiss.  *See Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d

---

[1]  Citations to page numbers in ECF No. 1-2, the Policy, are to the page numbers automatically generated by the Court's Electronic Case Filing system.

[2]  For ease of reading, capitalization is omitted from quotations of the Policy.

[3]  Although neither party saw fit to share the news with the Court, the claims against Western Union in the *Schansman* case were voluntarily dismissed with prejudice earlier this year.  *See Schansman*, ECF No. 366 (S.D.N.Y. June 23, 2022).  That may moot the question of indemnification, but the question of whether Hartford Fire is responsible for the costs of defending the suit until its dismissal remains a live dispute.

123, 126 (2d Cir. 2001). A court must assume the truth of all facts alleged in the nonmovant's pleading and draw all reasonable inferences in the non-movant's favor. *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301-02 (2d Cir. 2021); *accord Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). In deciding the motion, a court can "rely on the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009) (per curiam). And as is the case here, "[j]udgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).

The parties agree that Colorado substantive law applies. *See* ECF No. 16 ("Defs.' Mem."), at 7 n.2; ECF No. 27 ("Pl.'s Mem."), at 7 n.21; *see also, e.g.*, *Cargill, Inc. v. Charles Kowsky Res., Inc.*, 949 F.2d 51, 55 (2d Cir. 1991). Under Colorado law, the duty to defend is "designed to cast a broad net in favor of coverage and [is] construed liberally with a view toward affording the greatest possible protection to the insured." *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 502 (Colo. 2004) (internal quotation marks omitted). Thus, "[a]n insurer seeking to avoid its duty to defend an insured bears a heavy burden." *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991). Specifically, "[a]n insurer's duty to defend arises when the underlying complaint against the insure[d] alleges any facts that might fall within the coverage of the policy." *Hecla Mining Co.*, 811 P.2d at 1089. That is so even if "the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded." *Id.*. "[I]f the alleged

facts even potentially trigger coverage under the policy, the insurer is bound to provide a defense." *Cyprus Amax Mins. Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003).

To defeat a duty to defend, therefore, an insurer — here, Hartford Fire — must "establish that the allegations in the [underlying] complaint are solely and entirely within the exclusions in the insurance policy" and that "there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured." *Hecla Mining Co.*, 811 P.2d at 1090. By contrast, the insured — here, Western Union — "need only show that the underlying claim *may* fall within policy coverage; the insurer must prove that it *cannot*." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 614 (Colo. 1999) (emphases added). To the extent that the dispute turns on the meaning of the applicable policy, the Court must give each term its "plain and ordinary meaning." *Thompson*, 84 P.3d at 501; *accord Renfandt v. N.Y. Life Ins. Co.*, 419 P.3d 576, 580 (Colo. 2018). To ascertain such meaning, Colorado courts look to dictionary definitions and to how state courts of last resort and the federal courts of appeals have interpreted the term at issue. *See, e.g.*, *Hecla Mining Co.*, 811 P.2d at 1091-92; *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 823 (Colo. 2004).

**DISCUSSION**

Although Hartford Fire initially invoked only the War Exclusion in denying Western Union's request for coverage, *see* ECF No. 1-4, it relies on two different exclusions here: the War Exclusion and an exclusion for bodily injury "resulting from the rendering of or the failure to render financial services by any insured" (the "Financial Services Exclusion"), *see* Policy 56; Pl.'s Mem. 17-23.[4] The parties agree that if either of these exclusions applies, Hartford Fire is

---

[4] Hartford Fire contends that it has no duty to defend or indemnify Western Union for other reasons as well, *see* Compl. ¶¶ 34-42; Pl.'s Mem. 23-27, but the Court need not and does not address those other arguments here.

4

entitled to judgment on the pleadings and Western Union's counterclaims — for breach of contract and bad faith — must be dismissed. *See* Pl.'s Mem. 27-29; ECF No. 23 ("Defs.' Reply"), at 15-16; *see also, e.g.*, *Gebremedhin v. Am. Family Mutual Ins. Co.*, No. 13-CV-02813, 2016 WL 695948, at *3 (D. Colo. Feb. 22, 2016) ("[An insured's] claims for breach of contract and bad faith breach of an insurance contract turn on the question of whether [the insurer] had any duty to defend . . . . If [the insurer] had no duty to defend . . . then its refusal to do so, as a matter of law, cannot constitute breach."). For the reasons that follow, the Court concludes that both the War Exclusion and the Financial Services Exclusion do indeed apply.

**A. The War Exclusion**

The Court begins with the War Exclusion, which provides that the Policy does not apply to:

> "Bodily injury" or "property damage", [sic] however caused, arising, directly or indirectly, out of:
>
> (1) War, including undeclared or civil war;
>
> (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
>
> (3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

Policy 14, § I(2)(i). Per the plain language of the Exclusion, each prong is independent. Thus, the War Exclusion applies if Schansman's death arose, directly or indirectly, out of "war," "warlike action," *or* "insurrection, rebellion, revolution, [or] usurped power." *Id.*

Here, there is no need to decide whether the *Schansman* case falls within the scope of the exclusion for "war" and "warlike action" because it falls squarely within the exclusion for "insurrection." To date, Colorado courts have not addressed the meaning of the term "insurrection" in the insurance context, but several federal courts of appeals have done so. *See*

5

*Home Ins. Co. of N.Y. v. Davila*, 212 F.2d 731, 736 (1st Cir. 1954); *Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1017-19 (2d Cir. 1974); *Younis Bros. & Co., Inc. v. CIGNA Worldwide Ins. Co.*, 91 F.3d 13, 14 (3d Cir. 1996). As the Second Circuit explained in *Pan Am*, "'[i]nsurrection,' . . . 'rebellion,' 'revolution,' and 'civil war' are progressive stages in the development of civil unrest, the most rudimentary form of which is 'insurrection.'" 505 F.2d at 1017. More specifically, the term means "(1) a violent uprising by a group or movement (2) acting for the specific purpose of overthrowing the constituted government and seizing its powers." *Id.* at 1017; *see id.* at 1005 ("[F]or there to be an 'insurrection' there must be an intent to overthrow a lawfully constituted regime . . . .").[5] Notably, to qualify as insurrection, "the revolutionary purpose need not be objectively reasonable. Any intent to overthrow, no matter how quixotic, is sufficient." *Id.* at 1018.

This definition plainly encompasses the DPR's downing of MH17 "by a surface-to-air missile launched from territory [it] controlled." *Schansman* Compl. ¶ 75. Among other things, the *Schansman* Complaint alleges that the DPR "seek[s] to . . . creat[e] a proto-state, Novorossiya, through the control of territory in Ukraine acquired through acts of intimidation and coercion." *Id.* ¶ 88; *see id.* ¶ 4 n.1 (explaining that the DPR is part of "an effort to create a pro-Russia confederated state through the forceful acquisition of power and control in eastern Ukraine"). The DPR, it continues, grew out of "demonstrations by pro-Russian and anti-Ukrainian government groups," which eventually led to the "occup[ation] [of] the Donetsk regional legislative building" by "the founder of the so-called 'People's Militia of Donbass,' who

---

[5] This definition is consistent with dictionary definitions of the term. *See, e.g.*, *Insurrection*, Black's Law Dictionary (11th ed. 2019) ("A violent revolt against an oppressive authority, usu. a government"; "[A]n organized an armed uprising against authority or operations of government."); *Insurrection*, Merriam-Webster's Dictionary ("[A]n act or instance of revolting against civil authority or an established government.").

6

demanded that he be made the head of Donetsk's regional government [and] thereafter proclaimed himself the 'governor' of the DPR." *Id.* ¶¶ 92-93.  To drive the point home, the *Schansman* Complaint explicitly states that the DPR is "unambiguous about [its] intent: to . . . undermin[e] the Government of Ukraine . . . [and] increas[e] the Russian Federation's control over territory in eastern Ukraine." *Id.* ¶ 4; *see also* Pl.'s Mem. 10-11 (listing examples of similar allegations).  In short, as alleged, the DPR was in the midst of a "violent uprising" to "overthrow[] the constituted government" — in other words, an insurrection — in eastern Ukraine when it shot down MH17.  *See Pan Am.*, 505 F.2d at 1017.  It follows that Schansman's death arose out of an "insurrection," *see, e.g.*, *Northern Ins. Co. v. Ekstrom*, 784 P.2d 320, 323 (Colo. 1989) (defining "'arising out of' to mean 'originat[ing] from,' 'grow[ing] out of,' or 'flow[ing] from'"), and the War Exclusion applies.

Importantly, Western Union implicitly concedes, and certainly does not dispute, that the *Schansman* Complaint alleges that the DPR was engaged in a violent uprising to overthrow the lawful government in eastern Ukraine and seize its powers.  Instead, it argues for coverage on the ground that there are

> *other* allegations in the *Schansman* Complaint that do not foreclose the possibility that DPR *also* may have been acting out of *other* motivations, including to: 'intimidate[e] and coerc[e] civilians'; 'influence the Ukrainian government and other governments seeking to contain Russian aggression'; 'profit,' specifically by stealing the personal belongings of its terror victims; and 'affect government policy and intimidate[] citizens around the world.'

Defs.' Reply 8 (emphases added) (quoting *Schansman* Compl. ¶¶ 4, 13, 81, 98).  But such other motivations are not inconsistent with insurrection.  And in any event, it does not matter if the DPR had *additional* motivations for its surface-to-air missile attack on MH17 beyond its desire to overthrow the Ukrainian government and establish a pro-Russia state.  As the First Circuit explained in *Davila*, an "insurrection" may exist even if a group's "objective" is to create "a

series of . . . 'civil commotions,'" to cause "embarrass[ment]" to the constituted government, or to spread "propaganda," so long as it "had *also* in mind the maximum objective" of overthrowing the government. 212 F.2d at 738 (emphasis added).

*Holiday Inns Inc. v. Aetna Ins. Co.*, 571 F. Supp. 1460 (S.D.N.Y 1983), on which Western Union relies, *see* Defs.' Reply 9, does not call for a different conclusion. At issue in the case was the destruction of Beirut's Holiday Inn hotel during fighting between armed forces in the city and whether the loss was covered by the plaintiffs' all-risk insurance policy with Aetna. *Id.* at 1467-72. As here, the insurer claimed it was not liable to its insureds because the insurance policy had an insurrection exclusion. *Id.* at 1464-65. Following *Pan Am.*, the court explained that "the test for insurrection is two-pronged: was there an identifiable 'group or movement'; and, if so, did that group or movement have the requisite intent to overthrow the established government and assume at least *de facto* governmental control itself?" *Id.* at 1487-88. The court ruled in favor of the insureds, both on the ground that the forces at issue were not an identifiable group or movement, and because the evidence did not support a finding of insurrectionary intent at all. *Id.* at 1488; *see id.* ("[N]o faction in [the] fighting can be identified as 'acting for the specific purpose of overthrowing the constituted government and seizing its powers.'"); *id.* ("[T]here is no evidence that the [fighting groups], in initiating the fighting which engulfed the Holiday Inn, were attempting the overthrow of the constitutionally structured government of Lebanon, and to seize its powers."); *id.* at 1491 ("[N]o such group with that specific intent ["to overthrow the central government [of Lebanon]"] existed."). By contrast, the *Schansman* Complaint plainly alleges that the DPR was an identifiable group or movement and that it had the "requisite intent to overthrow the established government [of Ukraine] and assume at least *de facto* governmental control itself." *Id.* at 1487-88.

8

In short, the Court holds that the claims against Western Union in the *Schansman* Complaint fall squarely within the Policy's War Exclusion. It follows that Hartford Fire has no duty to defend Western Union in the underlying litigation. And if Hartford Fire has no duty to defend Western Union, then it has no duty to indemnify it (to the extent that the voluntary dismissal did not moot the issue altogether). *See, e.g.*, *Compass Ins. Co.*, 984 P.2d at 621 ("[W]here there is no duty to defend, it follows that there can be no duty to indemnify.").

## B. The Financial Services Exclusion

In any event, even if the War Exclusion did not defeat Western Union's coverage claim, the Policy's Financial Services Exclusion would.[6] As relevant here, it provides that the Policy "does not apply to 'bodily injury' . . . resulting from the rendering of or the failure to render financial services by any insured to others." Policy 56. "Financial services" is defined, in turn, to "include . . . [a]cting as . . . [an] exchange agent, . . . clearing agent, or electronic funds transfer agent," arranging for "interbank transfers," and "[s]elling or issuing travelers checks, letters of credit, certified checks, bank checks or money orders." *Id*. By its terms, this language plainly encompasses the factual allegations against Western Union in the *Schansman* Complaint. Indeed, as alleged in the *Schansman* Complaint, Western Union's *sole* role in the downing of MH17 was its "ongoing and essential financial support to the DPR," *Schansman* Compl. ¶ 3, through the "rendering of . . . financial services," Policy 56; *see, e.g.*, *Schansman* Compl. ¶ 65 ("Western Union . . . provided money transfer services that allow individuals to send money to . . . publicly identified DPR fundraisers."); *id*. ¶ 67 ("Western Union . . . knowingly permitted the DPR to continue fundraising for their violent acts through [its] money transfer services."); *id*.

---

[6]  Although Hartford Fire did not rely on the Financial Services Exclusion in its initial denial of coverage, Western Union concedes that that does not constitute a waiver of the defense to coverage. *See* Defs.' Reply 3 n.3.

9

¶ 150 ("The DPR . . . detailed ways to donate . . . using the money transfer services of . . . Western Union."); *id.* ¶ 313 ("[The DPR] openly and publicly solicited funds in support of [its] efforts . . . through transfers utilizing . . . Western Union."); *see also* Pl.'s Mem. 18-19 (listing more examples). Put simply, the *Schansman* Complaint does not accuse Western Union of doing anything other than facilitating money transfers to the DPR, an activity squarely within the Financial Services Exclusion.

Western Union's only argument to the contrary is that the *Schansman* Complaint alleges that the company *also* provided "material support" to the DPR, and material support can "include a host of things beyond financial services." Defs.' Reply 12-13 (citing *Schansman* Compl. ¶¶ 2, 132). This argument falls flat, however, because "material support" is a broad legal term — derived from the Antiterrorism and Effective Death Penalty Act of 1996, 18 U.S.C. § 2339A(b)(1), the statute that the plaintiffs in *Schansman* accuse Western Union of violating — not a factual allegation. Under Colorado law, "[i]t is . . . the *factual allegations* in the complaint, and *not the legal claims*, that determine an insurer's duty" to defend. *Gerrity Co. v. Cigna Prop. & Cas. Ins. Co.*, 860 P.2d 606, 607 (Colo. App. 1993) (emphases added); *accord Landmark Am. Ins. Co. v. VO Remarketing Corp.*, 619 F. App'x 705, 712 (10th Cir. 2015); *Carolina Cas. Ins. Co. v. Pinnacol Assur.*, 425 F.3d 921, 929 (10th Cir. 2005); *see also Cool Sunshine Heating & Air Conditioning, Inc. v. Am. Family Mut. Ins. Co.*, No. 14-CV-1637, 2014 WL 7190233, at *5 (D. Colo. Dec. 17, 2014) (holding that "broad" and "conclusory allegations that . . . the insured . . . caused bodily injury and property damage" were insufficient to trigger the insurer's duty to defend because there were "no factual allegations of harm directly caused by" the insured (citing, among other cases, *Gerrity Co.*, 860 P.2d at 607)). And, as noted, the *factual* allegations against Western Union in the *Schansman* Complaint pertain exclusively to providing financial services.

Put differently, the only "material support" the *Schansman* Complaint alleges Western Union gave to the DPR *is* the "rendering of . . . financial services." *See* 18 U.S.C. § 2339A(b)(1) (defining "material support" to include "financial services").

Western Union cites the Tenth Circuit's decision in *DISH Network Corp. v. Arch Specialty Ins. Co.*, 659 F.3d 1010 (10th Cir. 2011) ("*DISH I*"), *see* Defs.' Reply 12-13, and the district court's decision on remand, *DISH Network Corp. v. Arch Specialty Ins. Co.*, 989 F. Supp. 2d 1137 (D. Colo. 2013) ("*DISH II*"), *see* Defs.' Mem. 20, but neither casts doubt on the application of the Financial Services Exclusion here. At issue in the *DISH Network* cases was whether an insurance policy that covered "advertising injury," but excluded injuries "arising out of the ownership, operation or use of any satellite," *see DISH II*, 989 F. Supp. 2d at 1153, was implicated by a lawsuit in which DISH was sued for "infring[ing] . . . patents by allowing its customers to perform pay-per-view ordering and customer service functions." *DISH I*, 659 F.3d at 1016 (cleaned up). The Tenth Circuit held, based on the "vague *factual* assertions made in the [underlying] complaint," that the lawsuit might be covered. *Id.* at 1022 (emphasis added). The court ruled that "[t]he complaint . . . *potentially* alleges advertising simply because it provides *no insight* into what 'pay-per-view ordering and customer service functions' entail." *Id.* at 1022 (emphasis added). On remand, the district court found that coverage was barred by an exclusion for "broadcasting," but observed in dictum that the insurers' interpretation of the "satellite exclusion" would render coverage "illusory" because, by virtue of the fact that DISH owned satellites, it would mean that *any* injury would arise from "the ownership, operation, or use of a satellite." *DISH II*, 989 F. Supp. 2d at 1153-54. Neither court's reasoning, however, aids Western Union here. As discussed above, "material support" is not a "vague *factual* assertion," and, regardless, the *Schansman* Complaint provides clear "insight" into what it means by

11

"material support": the "rendering . . . of financial services." And the Court's interpretation of the Financial Services Exclusion does not "impermissibly swallow up all coverage afforded to Western Union." Defs.' Mem. 20. It would not, for example, exclude coverage for a patent infringement claim or a slip-and-fall lawsuit. *Cf. DISH II*, 989 F. Supp. 2d at 1154 ("I, too, can envision no scenario in which the exclusion would not apply under [the insurer's] logic.")

In sum, the Court holds that the claims against Western Union in the *Schansman* Complaint also fall squarely within the Policy's Financial Services Exclusion.

## CONCLUSION

For the reasons stated above, Hartford Fire has no duty to defend or to indemnify Western Union in the *Schansman* lawsuit. Accordingly, Western Union's motion for partial judgment on the pleadings is DENIED, and Hartford Fire's cross-motion for judgment on the pleadings and motion to dismiss Western Union's counterclaims are both GRANTED.

The Clerk of Court is directed to terminate ECF Nos. 15 and 26, to enter judgment consistent with this Opinion and Order, and to close the case.

SO ORDERED.

Dated: September 22, 2022
       New York, New York

_____
JESSE M. FURMAN
United States District Judge